UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NUTRITION DISTRIBUTION, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>ENHANCED ATHLETE, INC., a Wyoming corporation, DOES 1 through 10, inclusive,<br><br>Defendant. | No. 2:17-cv-01491-TLN-KJN<br><br>**ORDER DENYING MOTION FOR SANCTIONS** |

This matter is before the Court pursuant to Plaintiff Nutrition Distribution, LLC's ("Plaintiff") Motion for Sanctions (Mot. for Sanctions, ECF No. 8.) against Defendant Enhanced Athlete, Inc. ("Defendant"). Defendant filed an opposition (Opp. to Mot. for Sanctions, ECF No. 17), and Plaintiff filed a reply, (Reply to Mot. for Sanctions, ECF No. 20). For the reasons set forth below, the Court hereby DENIES Plaintiff's Motion for Sanctions. (ECF No. 8.)

///
///
///
///
///

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 17, 2017, Plaintiff filed a complaint against Defendant for false advertising in violation of the Lanham Act § 43(a)(1)(B). (ECF No. 1.) The complaint alleges that Defendant, who markets and sells supplements to body builders, gym users, fitness enthusiasts, and athletes, falsely advertised several of its products containing Selective Androgen Receptor Modulators ("SARMs Products") on its website by "downplaying or expressly denying any negative side effects." (ECF No. 1 at 2.) Specifically, Plaintiff alleges that medical experts have concluded that the sale of SARMs Products is "highly dangerous to public safety." (ECF No. 1 at 2.) Therefore, Plaintiff alleges "Defendant knew, or should have known that its SARMS Products are not recognized as safe and effective for any of the uses suggested by Defendant[,] and therefore Defendant has knowingly and materially participated in a false, misleading and dangerous advertising campaign to promote and sell its [SARMs Products]." (ECF No. 1 at 3.)

On September 13, 2017, Defendant filed an answer. (ECF No. 6.) Shortly thereafter, on September 17, 2017, Defendant emailed a newsletter ("First Newsletter") to its customers, informing them of the lawsuit Plaintiff filed against it, and encouraging them to take action and voice their opinions regarding the lawsuit. (ECF No. 8-2.) In addition to emailing the First Newsletter, Defendant also posted it on its website. (ECF No. 8 at 4.) The First Newsletter explained that Tauler Smith LLP, Plaintiff's attorney, had a history of filing these types of lawsuits and "ha[s] been fairly successful extorting small business owners for tens of thousands of dollars." (ECF No. 8-2 at 1.) It stated that Plaintiff and his attorney "were attempting to take away your right to choose what you can and cannot experiment on yourself." (ECF No. 2 at 1.) The First Newsletter then described actions taken in an "equally baseless" lawsuit, where the defendant's supporters contacted the plaintiff's law firm to express their views, and in some cases took improper action to disrupt the firm in an effort to persuade the plaintiff to withdraw the lawsuit. (ECF No. 2 at 2–3.) While the First Newsletter stated that the recipients should not engage in illegal conduct, it nonetheless provided the following list of actions taken in the other lawsuit:

> Fax Machine: Sent 50-100 pages of all black paper as to burn through all their toner and overheat fax Machine[.] Put the number in a robodialer so no other faxes can be received since line constantly busy[.]
>
> Phone number: Called to tell their opinion about the lawsuit[.] Called to tell their experience with SARMs and how it benefited them[.] Just called and hung up[.] Put number in robo dialer and/or signed it up to various promotion sites so it was constantly receiving phone calls from solicitors. Filled up voicemail so no other clients were able to leave messages[.] Kept phone line ringing 24/7 so no other clients could reach the attorney, thus crippling their ability to operate[.]
>
> Web Site: Some of the more advanced customers were able to create a DDOS attack on the site, shutting it down entirely. Customers would go to the web site of the Plaintiff, make an order and then call their own credit card company and dispute the charge. Over 1% chargebacks results in the loss of credit card merchant account, thus shutting down the web site's ability to make online sales.
>
> Emails: Fans emailed all members of the staff of the law firm multiple times a day asking legitimate questions or making valid statements so as not to run afoul of harrassment [sic] charges. They did this so that internal pressure from the office resulted in the law suit not being worth the loss of other business.
>
> Physical Address: Fans would show up to the office and make it very clear as to what they thought about the attorney attempting to threaten their freedom of choice. Nails and other debris kept getting found all over the parking lot[.] Homeless people were paid to go into the office and make it a rather unpleasnt [sic] place[.]

(ECF No. 8-2 at 2–3.)

The First Newsletter then sought the contact information of those personally involved with Plaintiff or Plaintiff's counsel, Tauler Smith LLP, including "[g]irl friend's or wive's names, places of employement [sic], phone numbers or addresses." (ECF No. 8-2 at 3.) Additionally, it provided the email addresses of employees at Tauler Smith LLP, and told customers that a 50% off sale would be provided when the lawsuit was withdrawn. (ECF No. 8-2 at 3–5.)

On September 18, 2017, the day after the First Newsletter was posted, Defendant issued a subsequent newsletter ("Second Newsletter"), urging its supporters to stay within the confines of the law, including exercising their free speech rights by expressing only positive messages. (ECF No. 8-5.) The Second Newsletter noted that Defendant did not want its supporters to take action that would detract from the positive message of consumer freedom to purchase lawful products. (ECF No. 8-5.) It specifically stated in bold: "**We are sending this out to reiterate that we in**

**no shape or form want you to participate in any illegal activity.**" (ECF No. 8-5.) By September 20, 2017, three days after the initial posting, the portions of the First Newsletter that described improper conduct were removed from Defendant's website.[1] (ECF No. 11-1 at 74–77.)

Following the two newsletters, several of Defendant's customers emailed and called Tauler Smith LLP. (ECF No. 8-3.) Many of these emails simply voiced people's discontent over the lawsuit and asked Plaintiff to reconsider the lawsuit. (ECF No. 8-3.) Other emails were crude or gibberish. (ECF No. 8-3.) For example, one email read: "What right do you have to tell us what what [sic] we can put in or body??? Alcohol is one of the number one killers in the world, but it's OK. Same with tobacco . . . Why don't you put your efforts towards shutting them down instead of a little supplment [sic] site." (ECF No. 8-3 at 1.) Another read as follows: "I am emailing you to voice my discontent over the lawsuit you are filing against Enhanced Athlete. As Americans our freedoms are shrinking everyday and this lawsuit perpetuates this trend. Think about some of the freedoms you enjoy everyday. Maybe its [sic] the occasional drink after a stressful day. Your cigarette smoke break or even the cup of coffee? Now imagine that being taking away. I am sure this falls on deaf ears but hopefully you reconsider." (ECF No. 8-3 at 25.) In all, Plaintiff submitted documentation of 55 emails and 20 calls purportedly sent by Defendant's customers. (ECF Nos. 8-3; 8-4.)

Plaintiff also claims that following the newsletters, Plaintiff's counsel received three threats of violence. (ECF No. 8 at 8.) First, Plaintiff claims that Defendant's co-founder and online persona, Dr. Tony Huge, published a physical threat of violence directly at Plaintiff's counsel when he posted a personal conversation in which an unknown person stated that Plaintiff's counsel "underestimates the power of our community and the ability to fuck up his life." (ECF No. 8 at 8.) However, Plaintiff does not provide the publication, but instead provides a screen shot of what appears to be a private conversation. (ECF No. 8-11.) Additionally, Dr.

---

[1] Plaintiff and Defendant dispute when the First Newsletter was taken down. Plaintiff claims that it was removed as of September 26, 2017 (ECF No. 11-1 at 2), while Defendant claims it was removed within 48 hours of its original posting, (ECF No. 17 at 12). Based on the evidence provided, the Court finds that the portion of the First Newsletter describing improper conduct taken in other lawsuits was removed by September 20, 2017. The exhibit supporting Plaintiff's claim that the First Newsletter remained up until September 26, 2017 does not include the improper conduct language. (ECF No. 11-1 at 74–77.)

Huge's response to the unknown person states "Don't do anything stupid." (ECF No. 8-11.) From the conversation, it appears that Dr. Huge is telling the unknown individual to not engage in misconduct, including violent behavior. (ECF No. 8-11.) Second, Plaintiff claims that Dr. Huge commented to a Sacramento Business Journal that Plaintiff's counsel was "putting himself in jeopardy" by filing the case and that he would be "surprised if [Tauler] makes it out alive." (ECF No. 8 at 8–9.) Third, Plaintiff claims that a random Facebook user commented on a Facebook post to "order 66 Robert Tauler." (ECF No. 8-10.) Plaintiff claims that this term, coined from a Star Wars scene, is a common internet reference to commit murder. (ECF No. 8 at 8.) Defendant, conversely, maintains that there is no support that the post is a reference to commit murder, and in the bodybuilder community, "order 66" essentially means to publicly criticize someone. (ECF No. 17 at 19.)

## II. STANDARD OF LAW

A district court "has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001). "The most common utilization of inherent powers is a contempt sanction levied to 'protect[] the due and orderly administration of justice' and 'maintain[] the authority and dignity of the court.'" *Primus Auto. Fin. Servs. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)). However, "[b]efore awarding sanctions under its inherent powers, however, the court must make an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith.'" *Id.* (quoting *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980)).

A party demonstrates bad faith where it "knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Id.* at 649. "A party also demonstrates bad faith by 'delaying or disrupting the litigation or hampering enforcement of a court order.'" *Id.* (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978)). "The bad faith requirement sets a high threshold," and is not necessarily met even when a litigant's behavior is outrageous, inexcusable, and appalling. *Id.* "A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due

process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44.

### III. ANALYSIS

Plaintiff argues that Defendant's newsletters were solicitations for "recipients to engage in a campaign to harass [Plaintiff and its counsel], in order to obtain settlement leverage in this action," and thus constituted bad faith. (ECF No. 8 at 4.) Plaintiff also contends that the phone calls, emails, and threats it received as a result of the newsletters constituted bad faith. (ECF No. 8 at 13.) Defendant, conversely, argues that the issue on Plaintiff's Motion is not whether Defendant engaged in civil harassment, but rather whether Defendant acted in bad faith. (ECF No. 17 at 17.) Defendant maintains it has not acted in bad faith because within 24 hours of the issuance of the First Newsletter, it sent out the Second Newsletter urging "its supporters to confine their speech and actions to positive and lawful protests," and took down the First Newsletter shortly thereafter. (ECF No. 17 at 6.) Moreover, Defendant contends that its conduct did not result in any delay to Plaintiff's lawsuit, which is proceeding apace. (ECF No. 17 at 17.) Finally, Defendant argues that Defendant and its customers' conduct is protected by the First Amendment. (ECF No. 17 at 14.) For the reasons discussed below, the Court finds that Defendant did not act in bad faith.

Bad faith includes a broad range of willful improper conduct. *Fink*, 239 F.3d at 992. However, bad faith is only demonstrated when the judicial process is abused. *See Ass'n of Flight Attendants v. Horizon Air Indus.*, 976 F.2d 541, 549 (9th Cir. 1992) ("A court's inherent authority extends only to remedy abuses of the judicial process."). For example, bad faith is demonstrated where a party "knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Batarse*, 115 F.3d at 649. "A party also demonstrates bad faith by 'delaying or disrupting the litigation or hampering enforcement of a court order.'" *Id.* (quoting *Hutto*, 437 U.S. at 689 n.14).

Here, Plaintiff fails to demonstrate how Defendant abused the judicial process. While the Court is deeply troubled by Defendant's First Newsletter and its implication that Defendant's

6

customers should use illegal means to disrupt Plaintiff's counsel's business to obtain a withdrawal of the lawsuit, the Court also finds that within 24 hours of the issuance of the First Newsletter, Defendant issued a Second Newsletter clarifying its intentions. The Second Newsletter explicitly informed Defendant's customers to follow the law and only engage in legal conduct protected by the First Amendment. Additionally, within 72 hours, Defendant took down the portions of the First Newsletter that contained examples of improper conduct. Therefore, Defendant was merely encouraging others to utilize their First Amendment right. There is no question that encouraging others to partake in lawful speech is protected under the First Amendment. If Defendant's customers chose to engage in improper conduct that interfered with the judicial process, Defendant cannot be held responsible once Defendant made clear that such actions should not be taken.

However, the evidence establishes that neither Defendant, nor Defendant's customers, engaged in any of the improper tactics set forth in the First Newsletter, such as placing nails in Plaintiff's counsel's parking lot, hiring homeless people to go into Plaintiff's counsel's office, or harassing significant others, nor did they make credible threats of violence against Plaintiff's counsel. Rather, Defendant and Defendant's customers expressed their views on Plaintiff's lawsuit in an effort to persuade Plaintiff and its counsel to withdraw the lawsuit, albeit in colorful and hyperbolic language at times. It is clear that these phone calls, emails, and social media posts did not inhibit the judicial process, as within a week of the issuance of the First Newsletter, Plaintiff filed this Motion (ECF No. 8), an Opposition to Defendant's Ex Parte Application for Expedited Discovery (ECF No. 11), and a state court action against Defendant alleging the same conduct at issue in this Motion, (ECF No. 18-2).[2] Therefore, the litigation is proceeding uninterrupted, and Plaintiff has failed to demonstrate any abuse of the judicial process. Accordingly, the Court finds Defendant's conduct does not constitute bad faith and is not subject to sanctions.

---

[2] The Court takes judicial notice of the state court filing. Under Federal Rule of Evidence 201, a Court may take judicial notice of a "fact that (1) is not subject to reasonable dispute because it generally is known within a trial court's territorial jurisdiction, or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. "The court may take judicial notice of its own records in other cases, as well as records of an inferior court in other cases." *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).

## IV. CONCLUSION

For the foregoing reasons, the Court hereby DENIES Plaintiff's Motion for Sanctions.

IT IS SO ORDERED.

Dated: May 30, 2018

Troy L. Nunley
United States District Judge